**IN THE COURT OF APPEALS OF IOWA**

No. 23-1601
Filed August 21, 2024

**IN THE INTEREST OF B.M.,**
**Minor Child,**

**A.A., Mother,**
　　Petitioner-Appellee,

**F.M., Father,**
　　Respondent-Appellant.
_____

Appeal from the Iowa District Court for Marion County, Steven Guiter, Judge.

A father appeals the termination of his parental rights. **AFFIRMED.**

Sarah E. Dewein of Cunningham & Kelso, P.L.L.C., Urbandale, for appellant father.

Heidi Miller of The Law Office of Heidi Miller, Pleasantville, for appellee mother.

Yvonne C. Naanep, Des Moines, attorney and guardian ad litem for minor child.

Considered by Ahlers, P.J., and Chicchelly and Buller, JJ.

**AHLERS, Presiding Judge.**

The mother of a child born in 2011 petitioned to terminate the parental rights of the child's father on the ground of abandonment pursuant to Iowa Code section 600A.8(3)(b) (2022). Termination of parental rights under chapter 600A involves a two-step process of (1) establishing a statutory ground for termination and (2) proving termination is in the child's best interest. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). Both steps require proof by clear and convincing evidence. *Id.*

The juvenile court found the mother had satisfied both steps and granted her petition. The father appeals, challenging the juvenile court's decision on both steps. Our review is de novo and we give weight to the juvenile court's fact findings, especially as to witness credibility, but we are not bound by them. *Id.*

**I.      Abandonment as a Ground for Termination**

We start our discussion with the father's contention that the mother failed to prove the first step in the process—a statutory ground for termination. As noted, the mother relied on the statutory ground of abandonment in section 600A.8(3)(b). That section provides:

> If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.

> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself to be the parent of the child.

Iowa Code § 600A.8(3)(b). Chapter 600A also defines abandoning a minor child as "reject[ing] the duties imposed by the parent-child relationship . . . which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." *Id.* § 600A.2(20). A parent's subjective intent "unsupported by evidence of acts specified in [section 600A.8(3)(b)] . . . , does not preclude a determination that the parent has abandoned the child." *Id.* § 600A.8(3)(c).

To establish abandonment under section 600A.8(3)(b), the mother must prove the father failed to maintain substantial and continuous or repeated contact with the child. This is done by showing that the father failed to contribute to the child's support within his means or he failed to take all the actions listed in section 600A.8(3)(b)(1) through (3).

As to support, while the father is behind on his child support, neither the mother nor the juvenile court relied on this delinquency as a basis for termination, so we do not consider that issue. Additionally, there is no dispute the father has not lived with or seen the child since 2014, so the mother established the father failed to take the action listed in section 600A.8(3)(b)(3). The question for us is whether the mother proved that the father failed to take the actions listed in section 600A.8(3)(b)(1) and (2). There is little dispute the father failed to maintain the contact contemplated by those subparagraphs. The fighting issue is whether

the father's failure was caused by the mother preventing him from maintaining the required contact.

## II.    Timeline and Background

Before addressing this issue, a timeline and some background is in order. The parents lived together when the child was born in 2011. Their relationship ended in late 2014, not long after the father overdosed on illegal drugs. When the relationship ended, the mother moved out with the child. The father saw the child one time shortly after the relationship ended and has not seen the child since. From early 2015 through June 2020, the father was in prison. While in prison, the father sent two letters to the child—one in 2016 and one in 2017—but the mother didn't open them, wrote "return to sender" on them, and had them returned to the father. When the father called the mother from prison, the mother took steps to block future calls, so the prison prohibited the father from calling.

The father got out of prison in June 2020. For approximately fifteen months after his release, the father began sending one text message per month to the mother asking to see the child. The wording of each text was basically identical and was drafted with the assistance of the father's parole officer. This one-text-per-month strategy was suggested by the father's parole officer. It was designed to avoid any disagreement over what was said, avoid any claim of harassment by more frequent contacts, and try to take baby steps toward the father's reintegration into the child's life. It was also designed to avoid potential conflict—and violation of the father's parole—that could occur if the father just showed up at the mother's home. The mother ignored all the text messages. The mother also failed to

answer the phone when the child's paternal grandfather called on Christmas and the child's birthday.

In September 2021, the father relapsed on drugs, and his life went back into greater turmoil. The father made no attempt to contact the child or the mother between September 2021 and his return to prison on felony drug charges in May 2022—where he remained at the time of the termination hearing. A few months after the father's return to prison, the mother filed this action. The father then began sending letters to the child again. The father explained that he resumed writing letters not because he thought he needed to step up his efforts at contact in the face of the termination petition, but because the termination paperwork informed him that the mother's address had not changed. The father had mistakenly assumed that when his letters sent during his previous stint in prison were returned to sender that it was because the mother had moved. The mother never let the child see the father's letters.

## III.    Step One—Statutory Ground for Termination

With that background, we return to the fighting issue—was the father's failure to maintain sufficient contact with the child caused by the mother preventing such contact? Based on our de novo review, there is no question the mother improperly interfered with the father's attempts to contact the child by returning his letters, blocking his phone calls, and ignoring his texts requesting contact with the child. We also reject any suggestion by the mother that the father had the obligation to reach out to common friends and family members to try to contact the mother. To suggest the father had any obligation to enlist the help of third parties

to make indirect contact with the child or mother when the mother had rebuffed all efforts at direct contact borders on the absurd.

The mother's improper interference with the father's attempted contact gives us considerable pause. It certainly contributed to the father's lack of contact and most likely deterred more efforts by the father, as he was repeatedly stonewalled. But when we view the evidence as a whole, we conclude the lack of contact was caused more by the father's sporadic and half-hearted efforts at contact than by the mother's improper interference. For example, instead of just assuming his letters were returned because the mother had moved, the father could have easily double-checked to see if he had a good address. And, once he was released from prison, while we understand the concern about creating conflict that could result in parole problems, the father could have done more than send a once-a-month text message to show an interest in the child. Perhaps most damning to the father's case is the fact that, after he relapsed in September 2021, he made no efforts at contact of any kind until sending a few letters to the child from prison over a year later. In short, we conclude the mother established that the father failed to meet the contact requirements of section 600A.8(3)(b)(1) and (2), and therefore established a statutory ground for terminating the father's parental rights.

## IV. Step Two—Best Interest of the Child

We turn next to the question of whether the mother proved termination of the father's parental rights is in the child's best interest. *See In re Q.G.*, 911 N.W.2d 761, 770 (Iowa 2018) (describing the two-step process under chapter 600A, with the second step being determining whether termination is in

the child's best interest). We have little difficulty determining that termination is in the child's best interest.

The father has not seen the child since 2014. Besides not actually seeing the child, the father has also not communicated with him since then. As we have already discussed, this is in part due to the mother's improper interference, but it is even more due to the father's lackluster efforts to maintain any place of importance in the child's life. The father's struggles with drug addiction coupled with past and present extended periods of incarceration have further prevented the father from playing any meaningful role in the child's life. We commend the father for completing various parenting-related classes in prison and his efforts to improve himself. But the father has much more to accomplish before he can overcome the dysfunction in his life. The child should not have to wait for that to happen. *See id.* at 771 (noting that we borrow from chapter 232 in determining best interests under chapter 600A); *In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) (holding we do not delay terminating a parent's rights by hoping a parent will learn to be a parent someday and provide a stable home).

In contrast, the child is doing well in his home with his mother and stepfather. The child views the stepfather as his father, and the stepfather wants to adopt the child. *See In re G.A.*, 826 N.W.2d 125, 131 (Iowa Ct. App. 2012) (noting a stepparent's willingness to adopt as a favorable consideration in assessing whether termination of parental rights is in the child's best interest). Considering the child's stability in his home with his mother and stepfather, the father's lack of involvement in the child's life for a long time, and the continuing

dysfunction that swirls around the father, we find it to be in the child's best interest to terminate the father's parental rights.

**AFFIRMED.**